### A. G. MINER v. THOMAS FURNACE CO.

1. EASEMENT MAY BE SURRENDERED FOR A CONSIDERATION.

An easement and servitude appurtenant to dominant estate may be relinquished in whole or in part, or abandoned, and a contract for its surrender may be made for a consideration which the courts will enforce.

2. RULE APPLIED BETWEEN RIPARIAN PROPRIETORS.

The owner of a grist mill situated upon a mill race and having the right, under an order of partition, as first user to a specific use of the water, as against a lower riparian owner, cannot sell the water as such, but has a right to restrict his use and relinquish his right in favor of such riparian owner; and a contract therefor is supported by full and ample consideration.

3. LOWER PROPRIETOR HAS NO RIGHT TO WATER CONFINED.

The owner of a grist mill, having been granted the first right to use all the water in a certain dam to furnish power for the operation of the grist mill as such, who for more than twenty-one years has maintained the dam and exercised the exclusive water privilege thereof, has the right to confine the water in the pond for the use of the grist mill, but is under no obligations to confine the water therein for a lower riparian owner. Therefore the latter has no rights to the water contained therein, and the laying of a pipe through the mill race into the pond and pumping water therefrom without consent of of the mill owner, would be a violation of legal rights.

Miner v. Furnace Co.

HEARD ON ERROR.

*M. J. Sloan* and *Chas. Filius*, for plaintiff, cited:

June v. Fremont, 54 Ohio St. 663; [46 N. E. Rep. 1160].

*Washington Hyde* and *E. E. Roberts*, for plaintiff, cited:

Findings of fact:   Oliver v. Moore, 23 Ohio St. 473.

Appurtenance:   Meek v. Breckenridge, 29 Ohio St. 642.

Riparian rights: 2 Blackst. 18; Cooper v. Williams, 4 Ohio, 253, 286; Cooper v. Williams, 5 Ohio, 391 [24 Am. Dec. 299]; Morgan v. Mason, 20 Ohio, 401 [55 Am. Dec. 464]; 15 Am. & Eng. Enc. Law (1 ed.) 484; Lamb v. Rickets, 11 Ohio, 311; Day v. Railway Co., 44 Ohio St. 406 [7 N. E. Rep. 528]; June v. Purcell, 36 Ohio St. 396.

Adverse possession:   Buckingham v. Smith, 10 Ohio, 288.

The record shows that the plaintiff in error, Jennie V. L. Miner, is the owner of the grist mill and water power and privilege appurtenant thereto in the city of Niles and located upon Mosketo creek. Mosketo creek comes down into the city of Niles from the north, passes across Robins avenue under the Erie railroad, past the land of the Thomas Furnace Company (owned by Margaret Thomas) thence, under the Pittsburg & Western railroad, on down past the site of the grist mill, thence a short distance further into the Mahoning river. The Thomas Furnace Company property, located upon the map, is bounded north by the Erie railroad, west by Mosketo creek and south by the Pittsburg & Western railroad, and is said, by defendant's witnesses in this case, to have a frontage on Mosketo creek of from five to six hundred feet, and contains four or five acres of land. It does not reach down as far as the grist mill within eight or nine hundred feet. Just north of the Erie railroad and of Robins avenue is a dam built across Mosketo creek, forming a mill pond above it. From the west end of this dam a mill race leads off to the south across Robins avenue and under the Erie railroad, and thence in a southwesterly direction to the grist mill. The water collected by this dam is conducted through this race to the mill where there are two turbine water wheels and is used when there is sufficient water in the creek, in operating the mill.

Said plaintiff, Jennie V. L. Miner, at the time of the making of the contract upon which suit was brought, was the owner in fee simple of the grist mill property and plant and of the right to the use, through the race, of the water privilege and power afforded by the dam and creek. Said plaintiff was at that time the absolute owner of the right to maintain the race and dam and mill pond, to the end that she might enjoy said water privilege and power. The nature and extent of the privileges annexed and appurtenant to the grist mill were originally determined in the proceedings in partition of the estate of Warren Heaton, and the said plaintiff succeeded to the ownership thereof by various and successive conveyances.

By the proceedings in partition it appears that there was set off to Julia H. Woods, a daughter of Warren Heaton, the grist mill, and to Eliza M. Heaton the forge and furnace property so called, and to James M. Heaton the saw mill lot.   See map "A to A."

And in connection with the grist mill set off to Julia H. Woods there was set off to her as a part of it, and appurtenant to it, the first right to use all the water of the dam through the race to drive the grist mill with all the machinery attached, for milling purposes, and in case

the proprietors of the grist mill property should abandon the use of the water to propel the grist mill, then they should be entitled to the first right to use as much water as would be required to propel three run of ordinary millstone, to be computed in the usual and customary way of determining the power, together with the right to keep up the race-way and the dam. There can be no doubt but that the commissioners, at the time they set this property off to Julia H. Woods, had in mind the three run of stone then in the mill. It clearly appears that it took from seventy-five to one hundred horse power to run three run of stones, such as are referred to in the partition proceedings and that no more than that horse power was required, indeed not so much, to run the two turbine wheels now in use at the grist mill.

The water power made appurtenant to the furnace lot and saw mill lot was, expressly in the proceedings of partition, made subject to the prior right of the grist mill, and it fully appears that the water rights set off to said old furnace lot and the said saw mill lot were each abandoned more than thirty years ago and the furnace and saw mill lots have for more than thirty years been abandoned as manufacturing sites, yet when they were used it appears, in the evidence of John Ohl, that the proprietor of those respective properties were obliged to quit the use of water when there was not more than enough to supply the grist mill.

It also appears, and was so found by the court, that when the pond was full, that is, the water was just running over the top of the dam, there was then just power sufficient to run the grist mill and as, with use, the water in the mill pond diminished and fell below the top of the dam and lower, it became less and less sufficient to the needs of the mill and the power it afforded had to be reinforced by steam power until the water in the pond fell a foot below the top of the dam, when it ceased to furnish any power whatever at the mill. And it appears that often during the long summer seasons especially dry spells, there were periods of greater or less length when the power furnished by the water was insufficient to run the mill and at times diminished below the point of any usefulness whatever, and that when the water ceased to flow over the dam into the creek and so on past the Thomas Furnace Company lands the creek between the dam and the grist mill below was quite without water, all the water at such times flowing through the race and back into the creek below the grist mill and far below the Thomas Furnace Company property.

It also appears that for many years prior to the making of the contract upon which this suit was brought, the proprietor of the Thomas furnace had found it necessary to procure water from the pond or the race-way, which was always done by arranging with the grist mill proprietor for a consideration, for the water to run from the race into the creek just below the dam and so pass the Thomas furnace. This was done by putting a sluice in the bank of the race.

In this condition of things, the Thomas Furnace Company, desiring to use more water than it could otherwise get, on September 20, 1897, entered into the contract upon which this suit was based. The contract was drawn by John R. Thomas himself, was put in the form of a letter prepared by him, signed by the plaintiffs and then accepted by the Thomas Furnace Company. And immediately upon the execution of the contract, the Thomas Furnace Company laid the pipe specified in the contract. The pipe was laid from the Mosketo creek, commencing at the pumping station of the furnace company, across the lands of Marga-

ret Thomas through the bank of the race, to the bottom of the race, and thence along the bottom of the race up sixty feet into the mill pond. In order that it might be laid, and the gate in the race-way not entirely destroyed, the plaintiffs permitted the race-way under the railroad, where the foundation was rock, to be narrowed up by placing in a stick of timber about eight inches thick, so that the pipe could pass through this stick of timber and the gate drop down upon it, and in that way stop the flow of water. This, of course, interfered with the flow of the water in the race to the plaintiffs' mill. Immediately upon locating the pipe, the defendant commenced pumping with large, powerful engines and pumped water from that mill pond twenty-four hours a day continuously, and paid the stipulated rent therefor until the notion was conceived that the contract was invalid, that they could as well pump the water without leave of the plaintiffs and that they need not pay anything therefor to them.

HALE, J.

The case of Jennie V. Miner and others against the Thomas Furnace Company is a proceeding in error prosecuted in this court asking the reversal of the judgment of the court of common pleas.

The plaintiff in error was the plaintiff below. The Thomas Furnace Company was the name under which J. R. Thomas, prior to his decease, transacted business. On September 20, 1897, the Miners entered into a contract with Thomas in this form :

"NILES, OHIO, September 20, 1897.

"To Thomas Furnace Co., Niles, Ohio :

"Gentlemen : We hereby agree to furnish you water for the period of six years, commencing October 1, 1897, as much as will run through a six inch gate valve as follows ; so long as there will be water in dam to supply the said six inch valve. You at your own expense to lay an iron pipe from your furnace property in Niles, O., to the mill race at a point south of the Erie railroad; thence along the bottom of mill race to a point about 60 feet above the dam. You to pay us three hundred dollars ($300,) annually on the performance of the above agreement by us, payments to be made quarterly on or about the 1st days of January, April, July, and October, of each year.

"MRS. JENNIE V. S. MINER.
"A. G. MINER.

"Accepted: THOMAS FURNACE Co., by J. R. THOMAS.
"Witness: O. L. McCARTY, SARAH J. CLINE."

It is conceded that Mrs. Miner was the owner of this property at the time. Immediately after this contract was made the changes contemplated by it were made, and the Thomas Furnace Company entered into the full enjoyment of the contract, and have so remained to the present time.

Thomas died on January 25, 1898. The defendants, his executors, are defending this action. Prior to his death he paid all installments falling due under this contract, and his executors, after his death, made the payment falling due on April 1, 1898, but have refused to make further payments.

This action was brought in the court of common pleas to collect the five installments, according to this contract, next falling due after April

1, 1898, when the last payment was made, amounting in all to the sum of $375.

The petition is in the ordinary form and need not be read. In their answer the executors admit the signing of the contract by Thomas; the payments alleged to have been made under the contract; the laying of the pipes by Thomas in the race, and deny each and every other allegation of the petition.

The real defense relied upon by the executors is that the contract was without consideration, and therefore void.

Trial was had, a jury being waived, to the court, and at the request of the plaintiffs, the findings of fact and the conclusions of law were stated separately. A bill of exceptions was taken, embodying all the evidence offered on this trial of the case. We have examined this evidence and are satisfied that the findings of facts are supported by sufficient evidence. At all events, we would not, for that reason, feel authorized to disturb the findings of fact.

We, therefore, are to consider the law as applicable to these facts. The court of common pleas sustained the contention of the defendants, holding as the law of the case that the contract was without consideration and void. It is to that conclusion of law that complaint is made.

The findings of fact are quite lengthy, and for the purpose of this decision need not be read. So far as essential to an understanding of our conclusions, it is only necessary to state a few facts.

We learn from these findings of fact that one Warren Heaton at his death owned a considerable quantity of land near what is now the city of Niles, along Mosketo creek. At a certain point on the creek he had erected a grist mill which he was then operating and had been for some years. Further up the creek he had constructed what is known in this record as the old forge and furnace, and that too he was operating. Still further up the creek he had erected and was operating a saw mill, and above all these three properties he had constructed a dam across the creek, confining the water in a mill pond for the use of the three properties.

Soon after his death, which occurred in 1842, partition proceedings were instituted by his heirs, and the partition was made of this property. The grist mill, with six-tenths of the water power, was assigned to Julia H. Woods, a daughter. The old forge and furnace property was assigned to the widow, Eliza M. Heaton, as a part of her dower. The saw mill property was assigned to James M. Heaton.

The commissioners, having assigned the property in this way, provided for the ownership and use of the water power in this way:

" From the estate of said Warren Heaton, deceased, not assigned to the widow as dower or set off by partition, there is a tract of about three acres situated in lots 4 and 5 on which the mill dam is erected and lying north of the road leading from Niles to Youngstown, which tract of about three acres it was by us considered necessary to be attached to the mill property or water power, and was valued as a privilege to the property attached; and assigned the said property to the following persons, to-wit: to Julia H. Woods six-tenths as property and privilege attached to the grist mill property and to Eliza M. Heaton three tenths property and privilege attached as dower to the furnace property, valued at $3,000, to James H. Heaton one-tenth part as property and privilege attached to saw mill property.

" Power and privilege of water, etc.

" To Julia H. Woods first right to use all the water necessary to drive the grist mill with all the machinery attached for milling purposes; but not to use the water for the purpose of propelling any other machinery, so long as water is used as power to propel the machinery for said mill; but in case that the proprietors of said mill property shall abandon the use of water to propel said grist mill, then they shall be entitled to the first right to use water sufficient to propel three run of ordinary millstones, to be computed in the usual and customary way of determining said power, with the right to enter upon the property known as the furnace property, and saw mill property for the purpose of repairing and keeping up the race to said mill. And it is by us further determined that said Julia H. Woods, or those acting under her, shall pay six-tenths of the expenses incurred in keeping up the dam on said three acres; and the race from said dam to the fore bay to the saw mill."

And then follows the statement as to the rights of Eliza M. Heaton, and her obligation to keep a portion of the dam in repair.

It seems from this record that the old forge and furnace and the saw mill have long since been abandoned, and that the owners of the grist mill have for more than twenty-one years—stated here in argument to be thirty—maintained exclusively, at the expense of the owners of the mill, the dam and race. Margaret Thomas, the wife of J. R. Thomas, party to this contract, owned the old saw mill lot, and also held the legal title to the premises upon which the Thomas Furnace Company was located on the east side of the creek. The three properties that I have mentioned as belonging to Warren Heaton were upon the west side of the creek.

For many years prior to this contract the Thomas Furnace Company had supplied the furnace company with water pumped from the creek adjacent to the Thomas Furnace Company's property. At the date of this contract, the Miners, or, perhaps more properly it would be said, Mrs. Miner, were in the exclusive possession and use of the dam, mill pond, and race. All other former uses of this race and dam had been for more than twenty-one years abandoned. The Thomas Furnace Company had no right to the water or enjoyment of either. The first right to the use of the water, so far as necessary to operate the grist mill, was in the owner of that mill. At times the water in the creek was not sufficient for that purpose. The first right to the use of this water, whatever run through the race, was surrendered by this contract to Thomas in part. The right to lay the pipe in the race was by this contract conveyed to Thomas. It seems clear to us that Thomas had no right to make the changes that were made in the race, and the gate and lay the pipe as he did, without the consent of Mrs. Miner, and the making of such changes without her consent would have been a violation of the legal rights of the plaintiff.

This right and privilege was surrendered by the plaintiff and acquired by the defendant by this contract. Before this contract the Thomas Furnace Company had only the use of water which fl w d over the dam. By the contract Thomas acquired the right to use the water even though it did not flow over the dam.

In short, we are entirely clear that by this contract the legal rights of the parties were changed. The effect of this contract was not a sale of the water as such. The Miners had the right to confine the water

of the creek in the mill pond for the use of the grist mill by means of a dam, maintained and kept in repair by them.

The plaintiff was under no obligation to confine the water in the mill pond for the Thomas Furnace Company, and that company had no right to take water from the pond after it had been confined in the manner proposed, without consent of the plaintiff.

It is important, in considering the rights of the parties in this action, to recognize the conceded fact that for more than twenty-one years the old forge and saw mill had been abandoned and the race and dam maintained solely for the use of the grist mill. Besides, it is fairly implied from this contract as a part of the agreement that the plaintiff should maintain, during the life of this contract, this dam at her own expense. An easement and servitude appurtenant to a dominant estate manifestly may be relinquished, in whole or in part, given up, abandoned. This may be done voluntarily or for the benefit of another, and a contract for its surrender may be made for a consideration which courts will enforce. We know of no reason why one owning a dominant estate and the appurtenances may not part with the appurtenance for a consideration which will support the contract.

But, as we understand it, it is contended that Thomas or Mrs. Thomas was a riparian owner upon this creek, and by this contract obtained no rights which she did not have as such riparian owner, and that the owner of the grist mill parted with no rights to the Thomas Furnace Company, which the Thomas Furnace Company did not have. It is said that Mrs. Thomas owned the saw mill lot, and the lot on which the Thomas Furnace Company was located, and as a riparian owner had the right to all the water of Mosketo creek not used by proprietors higher up the stream; that the grist mill of the Miners was higher up, by virtue of the mill right, the appurtenance, and her only right was to the use of the water for her mill.

The argument we suppose is that she could not sell the water nor part with her right of user of the water. This, we think, is not sound. While she couldn't sell the water as such, she had the right to restrict her use of the water. If she had the right to a specific use of the water against a lower riparian owner, she might for a consideration relinquish that right in favor of that riparian owner.

Now, without extending the discussion further, we feel entirely clear that this contract between these parties is supported by full and ample consideration, and was valid.

For the error in finding, as a conclusion of law from the facts, that this contract was without consideration and void, we feel compelled to reverse this judgment, and inasmuch as this is the only error which we find upon the record, the judgment which should have been rendered in the court below, may be entered in this court.

The case is therefore reversed and judgment rendered in favor of the plaintiff against the defendants for the full amount asked in the petition, and cause remanded to the court of common pleas for execution.